## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| StoreWorks Technologies, Limited, | Case No. 19-cv-1527 (SRN/HB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Aurus, Inc., | |
| Defendant. | |

Perssis Meshkat-Razavi and Sarah E. Bushnell, Arthur Chapman Kettering Smetak and Pikala PA, 500 Young Qunilan Building, 81 South Ninth Street, Minneapolis, MN 55402, for Plaintiff.

James R. Magnuson, Mohrman, Kaardal & Erickson, P.A., 150 South Fifth Street Suite 3100, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

Defendant Aurus, Inc. ("Aurus") moves to dismiss this action for lack of personal jurisdiction or under the doctrine of *forum non conveniens* or, in the alternative, to transfer the case to the District of Massachusetts. [Doc. No. 11.] For the reasons set forth below, the Court denies the motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A. *Parties' Background and Reseller Agreement*

This contract dispute arises out of Aurus' alleged failure to pay Plaintiff StoreWorks Technologies Limited ("StoreWorks") for referral commissions and rendered services.

StoreWorks also claims that Aurus intentionally interfered with StoreWorks' business relationship with Target, a Minnesota-based company. In February 2015, Aurus, a software company based in Massachusetts, and StoreWorks, a Minnesota consulting services company, entered into a Reseller Services Agreement in which StoreWorks agreed to refer new retail clients to Aurus for software development services relating to a platform that Aurus developed for securing credit and debit card payments. (Compl. [Doc. No. 1] ("Compl.") ¶¶ 2-3, 7, 11-13, 26 n.2.) Aurus' platform was then sold to retail clients. (*Id.* ¶¶ 7, 14-15.)

Under the Reseller Agreement, if Aurus agreed to provide software-related services for the platform to clients referred by StoreWorks, then Aurus was obligated to pay a "referral commission" to StoreWorks for each referred client. (*Id.* ¶ 25.) The Reseller Agreement also provides that Aurus will continue to pay a referral commission fee to StoreWorks for the entire term of Aurus' contract with the referred client. (*Id.* ¶ 26.) From 2015 to 2018, StoreWorks referred several large retail clients to Aurus and also targeted potential retail clients in Minnesota. (*Id.* ¶¶ 35-40.) In targeting these clients in Minnesota (and around the United States), it is alleged that Aurus joined in on the sales efforts. (*See* Decl. of Anil Konkimalla ("Konkimalla Decl."), ¶¶ 7, 14-15 [Doc. No. 19].)

It is undisputed that StoreWorks' claims for overdue referral commission fees center on certain referred clients, none of which are based in Minnesota. (*See* Compl. ¶ 38; *see also* Def.'s Mem. of Law in Supp. of Mot. To Dismiss Compl. Pursuant to Fed. R. Civ. P. 12(b)(2) [Doc. No. 13] ("Def.'s Mem.") at 3; Decl. of Punam Metha ("P. Mutha Decl.") ¶ 9 [Doc. No. 14].) Nonetheless, the parties' joint sales efforts to obtain these referred clients

and provide related services required "regular and frequent contacts," by email and telephone, between Aurus employees and StoreWorks Minnesota employees. (Konkimalla Decl. ¶¶ 11-13.) For example, StoreWorks' employee Carole Watkins participated in telephone conference calls twice a week—led by an Aurus employee—relating to O'Reilly Auto Parts, one of the eight referred clients. (Decl. of Carole Watkins ("Watkins Decl.") ¶ 3 [Doc. No. 20]; *see* Compl. ¶ 38.) All referral commission fees for these clients were sent to Minnesota.

The Reseller Agreement had an initial term of three years and was set to expire on or about February 15, 2018. (Compl., Ex. A §§ 8(a)-(b).) The Agreement could, thereafter, continue on a month-to-month basis. (*Id.*) StoreWorks and Aurus agreed to the amount of monthly referral commissions that StoreWorks would be paid for each referred client and documented the compensation on Pricing Schedules. (Compl. ¶¶ 37-38.) The parties do not dispute that Aurus paid these referral commissions during the initial term of the Agreement. (*Id.* ¶ 40.) After the initial term, Aurus allegedly refused to pay StoreWorks' referral commissions still due under the Agreement's terms. (*Id.* ¶¶ 44-46.) Aurus also allegedly failed to pay one-time project fees in the amount of $15,000.[1] (*Id.* ¶ 45.)

### B. Aurus' Direct Contacts in the Forum

Before executing the Reseller Agreement, StoreWorks alleges that Aurus executives and employees traveled to Minnesota to engage in joint sales efforts and strategy. (*See* Konkimalla Decl. ¶ 15 (a)-(b), Exs. 2-3.) StoreWorks alleges that at least three in-person

---

[1] StoreWorks does not specify whether this project-fee relates to a specific client.

meetings occurred with Aurus employees in Minnesota before the execution of the Reseller Agreement. (*Id*., Ex. 2.) First, StoreWorks alleges that two meetings occurred in July and early August 2014. (*Id*.) On both occasions, Aurus CEO Rahul Mutha came to Minnesota to attend sales meetings scheduled by StoreWorks, including a sales meeting with potential retail client Supervalu. (*Id*.) Second, StoreWorks alleges that in September 2014, Mr. Mutha wrote an email to StoreWorks owner Troy Stelzer suggesting that, after a meeting with StoreWorks employees in Duluth, Minnesota, a follow-up meeting be scheduled with potential retail clients GreatClips and Holiday to "see if they have any interest from the previous discussions [*i.e.*, StoreWorks and Aurus] had with them." (Konkimalla Decl. ¶ 15 (b), Ex. 3.)

During the initial term of the Reseller Agreement, StoreWorks alleges that Aurus executives and employees continued to travel to Minnesota on "many occasions to receive sales training from StoreWorks, to engage in strategic conversations, and to engage in joint sales efforts with StoreWorks." (Compl. ¶ 6; Konkimalla Decl. ¶ 14.) If any of these joint sales efforts generated business, StoreWorks would be entitled to referral commissions under the Reseller Agreement. (Compl. Ex. A; Konkimalla Decl. ¶ 15.) StoreWorks specifically alleges at least nine in-person meetings with Aurus employees that took place in Minnesota during the initial term of the Reseller Agreement. (*See* Compl. ¶ 6; Konkimalla Decl. ¶¶ 14, 16; Watkins Decl. ¶ 5.)

However, the record is unclear whether these meetings strictly related to Aurus' obligations under the Reseller Agreement or any of the eight referred clients. Separate from the Reseller Agreement, the business relationship between Aurus and StoreWorks

appears to have included services related to two Minnesota-based retail clients, Regis Corporation ("Regis") and Target. (Konkimalla Decl. ¶¶ 2-3, 8.) As to Regis, Aurus and StoreWorks jointly provided software and hardware services to this client beginning in 2008. (*Id*. ¶¶ 2-3.) As to Target, StoreWorks entered a hardware services contract with Target in November 2014, with Aurus subcontracted to provide software. (*Id*. ¶ 8.) Indeed, StoreWorks admits that this business arrangement was "handled under a different agreement" than the Reseller Agreement. (Konkimalla Decl. ¶ 15.) Under the Target agreement—referred as the "Consensus project" by the parties—StoreWorks provided payment terminals for Target stores throughout the United States and Aurus provided payment security software. (Compl. ¶ 47.) As identified below, several of the in-person meetings appear to overlap with client services provided to Regis and Target:

***First***, StoreWorks alleges that in May 2015, Mr. Mutha came to Minnesota "for, among other things, discussion of Aurus' role in the StoreWorks/Target Statement of Work for the Consensus Project." (Konkimalla Decl. ¶ 15, (c).) In an email dated May 20, 2015, Mr. Mutha stated that he would be in Minnesota that same day for a meeting with Target. (*Id*., Ex. 4.) As StoreWorks' counsel conceded during oral argument for the present motion, this May 2015 meeting appears to relate to the Consensus project, which is governed by a separate agreement.

***Second***, StoreWorks alleges that in July 2015, Mr. Mutha wrote to certain StoreWorks employees that he intended to make another "trip" to Minnesota for a meeting in "early August" of that year. (Konkimalla Decl. ¶ 15 (d).) Mr. Mutha stated that he would retrieve certain items ordered from Cisco that shipped to StoreWorks' office in

Minnesota.  (*Id.*, Ex. 5.)  It is unclear whether these Cisco items or Mr. Mutha's proposed trip related to any performance obligations under the Reseller Agreement or any of the eight referred clients.

**Third**, StoreWorks alleges that in September 2015, StoreWorks salesman Doug Schaff proposed a meeting with Aurus and the Target team in Minnesota "to discuss the partnership, Consensus project, and future integration and business opportunities." (Konkimalla Decl. ¶ 15 (e), Ex. 6.)  Mr. Mutha responded that he would "be making another trip to [Minnesota] over the next few weeks but that date is in the air."  (*Id.*, Ex. 6.)  This proposed September 2015 meeting appears to relate to the retail client Target, governed by a separate agreement.

**Fourth**, StoreWorks alleges that in November 2015, Mr. Mutha and two StoreWorks employees met in Minnesota to make a presentation to the Holiday Stations executive team about payment processing and security opportunities.  (Konkimalla Decl. ¶ 15, (f).)  On the same trip, Mr. Mutha and StoreWorks arranged to meet with Target and Best Buy.  (*Id.*, Exs. 7, 8.)  StoreWorks generally avers that these November 2015 meetings reflect "joint sales efforts with StoreWorks."  (*Id.* ¶ 15.)  In viewing the record in the light most favorable to StoreWorks, the Court finds that these November 2015 meetings related to joint sales efforts to obtain potential clients under the Reseller Agreement.[2]

**Fifth**, StoreWorks alleges that in January 2016, Mr. Mutha visited StoreWorks'

---

[2] Additionally, during oral argument, StoreWorks' counsel represented that Aurus' November 2015 meetings related to the Reseller Agreement.

Minnesota office to prepare for a joint sales presentation by StoreWorks and Aurus to Buffalo Wild Wings that was then made at the Buffalo Wild Wings office. (Konkimalla Decl. ¶ 15, Ex. 9.) Again, StoreWorks generally avers that this meeting reflects "joint sales efforts with StoreWorks." (*Id.* ¶ 15.) In viewing the record in the light most favorable to StoreWorks, the Court finds that this January 2016 meeting related to joint sales efforts to obtain a potential client under the Reseller Agreement.[3]

**Sixth**, StoreWorks alleges that in October 2016, Aurus employee Abhishek Kulkarni wrote to StoreWorks salesman Doug Schaff that he had an upcoming "meeting on Dec[ember] 7 [in the] afternoon in [Minnesota]" with Mr. Mutha. (Konkimalla Decl. ¶ 15.) Mr. Mutha had advised Mr. Kulkarni to check in with Mr. Schaff in case potential retail client "Buffalo Wild Wings [would] be interested… for a meeting." (*Id.*, Ex. 10.) Again, StoreWorks generally avers that this proposed meeting reflects "joint sales efforts with StoreWorks." (*Id.* ¶ 15.) In viewing the record in the light most favorable to StoreWorks, the Court finds that this proposed December 2016 meeting related to joint sales efforts to obtain a potential client under the Reseller Agreement.

**Seventh**, StoreWorks alleges that on March 13, 2017, Mr. Mutha visited StoreWorks' office in Minnesota. (Konkimalla Decl. ¶ 15.) While the record is unclear whether the meeting strictly related to the Reseller Agreement, Mr. Mutha requested to cover these topics with StoreWorks: "[1] operational review; [2] roles and responsibilities; [3] 2017 strategy." (Konkimalla Decl. ¶ 15, Ex. 11.) During oral argument, StoreWorks'

---

[3] During oral argument, StoreWorks' counsel again represented that Aurus' January 2016 meeting specifically related to the Reseller Agreement.

counsel represented that this meeting covered the "responsibilities and the 2017 strategy" for the Reseller Agreement.

**Eighth**, StoreWorks alleges that on January 18, 2018, Aurus employees Vinod Nighute and Ashwini Kumar and StoreWorks employees Carole Watkins and Pierre Korman met with Consensus Corporation employee Kevin Feito in Minneapolis, Minnesota. (Watkins Decl. ¶ 5.) This January 2018 meeting appears to relate to the Consensus project, governed by a separate agreement.

**Ninth**, StoreWorks generally alleges, while providing no dates or specifics, that for client prospects in Minnesota, Iowa, and Wisconsin, "Aurus executives and employees would generally fly to Minnesota and travel with StoreWorks employees to the sales meetings, though sometimes Aurus representatives would go directly to the prospect's office and meet the StoreWorks representatives there." (Konkimalla Decl. ¶ 16.)

To summarize the nine in-person meetings alleged above, the Court finds, in viewing the record in the light most favorable to StoreWorks, that Aurus executives and employees traveled to Minnesota on at least four occasions to engage in joint sales efforts relating to clients under the Reseller Agreement. (*See* Compl. ¶ 6; Konkimalla Decl. ¶¶ 14, 16; Watkins Decl. ¶ 5.)

Finally, during renegotiations of the Reseller Agreement, StoreWorks alleges that in June 2018, Mr. Mutha met with StoreWorks CEO Mr. Konkimalla to discuss "[n]ext [s]teps" for their business relationship after the termination of the Reseller Agreement. (Konkimalla Decl. ¶¶ 22-24, Ex. 15.) At a dinner meeting in Minnesota, Mr. Mutha allegedly stated that Aurus wanted to end the "current payment structure" on "existing

accounts" and end future referral commissions under the Reseller Agreement. (*Id.*, Ex. 15.) StoreWorks refused Aurus' demand. In a follow-up email, Mr. Konkimalla explained that it required Aurus to pay future commissions because StoreWorks' hardware margins were "minimal" and its business model relied on making margins on the "total solution" rather than "commoditized hardware":

> [StoreWorks'] hardware margins are minimal. For us to survive as a company, our business model dictates we must make our margins on the total solution rather than commoditized hardware. So, to differentiate ourselves, we invest significantly in our pre-sales consulting phase of the project. Sometimes these phases last for years. Though it is challenging, we need to recover this investment in the profit of the total solution. These were important considerations in shaping how we negotiated the original contract terms and the need for a payment on these accounts as long as they remained a customer. Also, we have a new boss and that is the Bank/SBA. The bank did extensive due diligence for more than 9 months as part of the SBA loan process. Part of the due diligence was to engage a 3rd party firm to do business valuation. The valuation and the final loan approval was done with consideration of our contracts and all the existing financial numbers including monthly recurring payments from Aurus. Because of all these interdependencies, it would pose a giant challenge for us if the monthly payments from Aurus stopped.

(*Id.*) Despite an alleged offer from StoreWorks for a lump sum payment to buy out Aurus' future obligations under the Reseller Agreement, renegotiation efforts collapsed. (*Id.*) In November 2018, the parties, represented by legal counsel, then tried mediation in Minneapolis, Minnesota. (Konkimalla Decl. ¶ 28.) Mediation was unsuccessful. (*Id.*)

### C. *Aurus' Physical Presence in the Forum*

Aurus has no employees or offices in Minnesota. (P. Mutha Decl., ¶ 4.) It is

undisputed, however, that one of Aurus' sixteen data centers is located in Chaska, Minnesota. (*Id.*, ¶ 5.) The parties vigorously contest the importance of this data center to Aurus' business operations. While Aurus asserts that this data center is only a "backup data center," StoreWorks alleges that the Minnesota data center played a pivotal role in problems with data volume for retail clients. (*Compare* P. Mutha Reply Decl. ¶ 10, Ex. C [Doc. No. 26] (Aurus client contract describing the Minnesota facility as the "secondary data center") *with* Konkimalla Decl. ¶¶ 17-19, Ex. 13 (Aurus email to Target describing Minnesota data center setup)). StoreWorks further alleges that the Minnesota data center was "primarily established to handle the data for Minnesota businesses Target and Regis." (Konkimalla Decl. ¶¶ 17-19; Ex. 13.)

Additionally, StoreWorks alleges that over the years, Aurus employees, including Mr. Mutha, visited Minnesota to set up and perform work at the data center. (*Id.*) For example, in September 2015, Mr. Mutha told StoreWorks CEO Anil Konkimalla, among others, that Mr. Mutha and other Aurus employees had spent at least four days working at the Minnesota data center and got "70%" of the work done, with another trip to be completed in "a few weeks to complete the rest." (Konkimalla Decl. Ex. 14.) In January 2016, Mr. Mutha came to Minnesota a day before a scheduled sales meeting with StoreWorks to "work[] at the data center late [at] night[.]" (*Id.*, Ex. 9.)

### D. The Parties' Business Relationship with Target

StoreWorks also alleges that Aurus actively interfered with StoreWorks' relationship with Target. (Compl. ¶ 52; Konkimalla Decl. ¶ 25.) StoreWorks alleges that Aurus attempted to poach Target's business in the midst of rumors of an alleged fallout

amongst the StoreWorks owners. (Compl. ¶¶ 41-44.) As part of Aurus' strategy, StoreWorks alleges that Aurus first unexpectedly notified StoreWorks on January 18, 2018 that the Reseller Agreement would terminate on its initial expiration date. (*Id.*)

Thereafter, on or about August 2018, when re-negotiations over the Reseller Agreement were allegedly failing, (Konkimalla Decl. Ex. 15), Aurus allegedly contracted with Target directly to provide payment terminal repair services for the Consensus project, "successfully competing with StoreWorks for this business." (*See* Pl's Mem. of Law in Opp. of Mot. To Dismiss Compl. Pursuant to Fed. R. Civ. P. 12(b)(2) [Doc. No. 18] ("Pl's Opp'n") at 11; *see also* Compl. ¶ 52; Konkimalla Decl. ¶ 25.) Several months later, in or about January 2019, Aurus told Target that "the payment security business should be directly between Target and Aurus," without StoreWorks functioning as the middle-man. (Konkimalla Decl. ¶ 26.) At the time, Target refused to change the arrangement. (*Id.*)

In response, in March 2019, Aurus' President and Chief Operating Officer, Punam Mutha, wrote to two Minnesota-based Target lawyers to inform Target that the Reseller Agreement had expired and would not be renewed. (Compl. ¶ 53, Ex. C.) Aurus again allegedly sought to "establish a direct contract" between Target and Aurus. (*Id.*) A month later, in April 2019, Aurus refused to enter into a written agreement that Target required StoreWorks to enter with Aurus as the software subcontractor. (Watkins Decl. ¶ 7, Ex. A.) In late May 2019, Target requested that StoreWorks and Aurus provide an enhancement to the Aurus software, "as needed from time to time." (Compl. ¶ 55; Watkins Decl. ¶ 8.) Aurus told Target that it was no longer willing to work through the current contractual process that involved StoreWorks, and that it would only complete the

requested work if it could work directly with Target.  (*Id*.)

### E. Procedural Background

Unable to resolve its differences with Aurus, StoreWorks filed this lawsuit on June 10, 2019.  (*See generally* Compl.)  In its suit, StoreWorks accuses Aurus of breach of contract and deceptive trade practices under Massachusetts statutory law for unfair competition.  (Compl. ¶¶ 58-64, 70-74.)  StoreWorks also seeks a declaratory judgment on its right to receive (i) referral commissions for clients identified in the Complaint; and (ii) referral commissions for any renewed or new contracts with the clients identified in the Complaint.  (Compl. ¶¶ 65-69.)  Specifically, StoreWorks requests to condition any renewal or entry into a new contract with the identified clients on "a mutual agreement . . . concerning referral commissions" with StoreWorks.  (*Id*.)

In this motion, Aurus challenges this Court's personal jurisdiction over it.  (Def's Mem at 1-8); *see also* [Doc. No. 11].)  While StoreWorks is a Minnesota corporation with its principal place of business in Minnesota (Compl. ¶ 2), Aurus is a Delaware corporation with its principal place of business in Massachusetts.  (Compl. ¶ 3; Mutha Decl. ¶ 4.)  Aurus further alleges that it has "no business operations or employees [] in Minnesota."  (Mutha Decl. ¶ 4.)  Alternatively, Aurus moves to dismiss the Complaint under the doctrine of *forum non conveniens*, or to transfer venue to the District of Massachusetts.  (Def's Mem. at 8-14.)

StoreWorks argues that this Court can exercise personal jurisdiction over Aurus because Aurus has "purposely and systematically directed its business activities at residents of Minnesota through the contracts at issue and many thousands of telephone, email, and

in-person contacts with StoreWorks in Minnesota–from which business activities Aurus has received millions of dollars in revenue." (*See* Pl's Opp'n at 1, 17-24; Compl. ¶¶ 5-9.) One of Aurus' sixteen physical data centers is also in Minnesota. (*See* P. Mutha Decl. ¶ 5.)

Aurus responds that it lacks sufficient contacts with this forum and challenges some of the relevance of the in-person meetings that StoreWorks alleges occurred in Minnesota. (*See* Decl. of Rahul Mutha [Doc. No. 25] ("R. Mutha Decl.") ¶¶ 3-7.) Aurus asserts that the Reseller Agreement does not have a substantial connection with Minnesota for four reasons. First, it argues that none of the clients that Aurus seeks commissions for are located in Minnesota. (Def's Reply Br. [Doc. No. 24] ("Def's Reply") at 2.) Second, it argues that the alleged breach did not occur in Minnesota. (*Id*.) Third, it argues that the Agreement between the parties was not negotiated in Minnesota. (Def's Reply at 8.) Finally, Aurus relies on the Massachusetts choice-of-law provision in the Agreement to suggest that this clause defeats personal jurisdiction. (Def's Reply at 8; *see* Compl. ¶ 29; Ex. A, Section 2(d).) No venue is explicitly designated under the Reseller Agreement.

## III. DISCUSSION

### A. Standard of Review

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the plaintiff must make a prima facie showing that the court's exercise of jurisdiction is proper. *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014). The plaintiff may meet this burden by pleading facts sufficient to "support a reasonable inference that the defendant[] can be subjected to jurisdiction within the [forum] state." *Dever v. Hentzen*

*Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004). This inference is subject to testing not solely on the pleadings alone, however, but by any "affidavits and exhibits presented" with the motion. *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012) (citation omitted). However, "the action should not be dismissed for lack of jurisdiction if the evidence, viewed in the light most favorable to [StoreWorks], is sufficient to support the conclusion that the exercise of personal jurisdiction over [Aurus] is proper." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015).

When—as is the case here—the Court has not conducted an evidentiary hearing, it must view the facts in the light most favorable to the nonmoving party, and resolve all factual conflicts in that party's favor. *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011). Thus, although Aurus directly contradicts certain contacts with the forum alleged by StoreWorks, this Court resolves all factual conflicts in StoreWorks' favor. (*See, e.g.*, R. Mutha Decl., ¶¶ 3-7; *cf.* Konkimalla Decl. ¶ 14.) Keeping these principles in mind, the Court turns to an analysis of personal jurisdiction.

### B. Personal Jurisdiction

To determine whether personal jurisdiction over a defendant is proper, a federal court sitting in diversity must first determine that certain state and constitutional prerequisites have been met. *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1431 (8th Cir. 1995). First, the court must consider whether the requirements of Minnesota's long-arm statute have been satisfied. Second, the court must ask whether exercising jurisdiction over the defendant would comport with the Due Process Clause of the Fourteenth Amendment. In Minnesota, however, these two inquiries combine into a

14

single due process examination, because the state long-arm statute has been held to be co-extensive with the constitutional bounds of jurisdiction. *See Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc.*, 950 F.2d 526, 528 (8th Cir. 1991) (citing *Rostad v. On-Deck, Inc.*, 372 N.W.2d 717, 719 (Minn. 1985)).

The Due Process Clause permits a court to exercise personal jurisdiction over a non-resident defendant when that defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). Underlying this standard is the conviction that "those who live or operate primarily outside a State have a . . . right not to be subjected to judgment in its courts as a general matter." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011). Thus, the Supreme Court has made clear that there must be some showing that the defendant's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

From these core principles, the Eighth Circuit has distilled a five-factor test to be used in analyzing the propriety of a court's exercise of personal jurisdiction over a non-resident defendant. This test considers: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. *See Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010) (citing *Bell Paper Box, Inc. v. U.S. Kids, Inc.*,

22 F.3d 816, 819 (8th Cir. 1994)). "The first three factors are closely related and are of primary importance, while the last two factors are secondary." *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) (citing *Digi–Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996)).

Moreover, the third factor, the relation of the cause of action to the contacts, serves to distinguish the appropriate theory of jurisdiction: general or specific. "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol–Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017) (emphasis in original). Specific personal jurisdiction, on the other hand, "is very different." *Id.* "In order for a state court to exercise specific jurisdiction, the suit must arise out of or relate to the defendant's contacts with the forum." *Id.* (citations and alterations omitted).

In breach of contract cases, "courts determine whether a defendant purposefully availed itself of the forum state by considering prior negotiations between the parties, contemplated future consequences, terms of the contract, and the parties' actual course of dealings." *Rust Consulting, Inc. v. Schneider Wallace Cottrell Konecky Wotkyns, LLP*, No. CV 17-4981(DSD/FLN), 2018 WL 1247390, *2 (D. Minn. Mar. 9, 2018) (citing *Morris v. Barkbuster, Inc.*, 923 F.2d 1277, 1283 (8th Cir. 1991).)

### 1.  General Personal Jurisdiction

The Court agrees with Aurus that it is not subject to the Court's general jurisdiction because its contacts with Minnesota are not so substantial that it would be at home in the state. *Daimler AG v. Bauman*, 134 S. Ct. 746, 761-62 (2014) (holding that defendant was

not subject to general personal jurisdiction where it was neither incorporated in the state or had its principal business there). It is undisputed that Aurus is not incorporated in Minnesota nor does it have any employees or physical offices in the State. The Court further finds that Aurus' Minnesota data center, while storing data for two Minnesota-based clients, is insufficient to establish either "continuous" or "systematic" contact to the point of rendering Aurus "at home" in Minnesota. This connection is particularly attenuated where, as here, Aurus has fifteen other data centers distributed throughout the United States. *See*, *e.g.*, *Fireclean LLC v. Tuohy,* 16-CV-294 (JCC/MSN), 2016 WL 4414845, *10, n. 7 (E.D. Va. June 14, 2016) (finding defendant's data center located in forum, when several of its data centers were in different cities outside forum, insufficient to establish personal jurisdiction). Additionally, according to Punam Mutha, Aurus' President and Chief Operating Officer, less than 5% of Aurus' overall business revenue is generated from Minnesota. (P. Mutha Reply Decl. ¶ 8.) Thus, even though there may be some Minnesota revenue stream and solicitation of business in Minnesota, (*see* Pl.'s Opp'n at 9; Konkimalla Decl., ¶ 20), Aurus' activities are insufficient to satisfy general jurisdictional requirements. Accordingly, the Court turns to an analysis of specific personal jurisdiction.

## 2. Specific Personal Jurisdiction

When considering specific jurisdiction in breach of contract cases, courts weigh the quality and quantity of a defendant's contacts with the forum state by considering (i) whether the defendant solicited a business relationship with a company incorporated in the forum state, (ii) the frequency of correspondence sent by the defendant to the forum state, (iii) whether the contract contains a choice-of-law provision that specifies the forum

state's law, and (iv) whether the contract required the defendant to remit payment to an address in the forum state. *See Creative Calling Sols., Inc*, 799 F.3d at 980–81; *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 593–95 (8th Cir. 2011); *Digi–Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996); *K–Tel Int'l, Inc. v. Tristar Prods., Inc.*, 169 F. Supp. 2d 1033, 1041 (D. Minn. 2001). The specification of a choice of law different from the forum state is a relevant, "but not dispositive factor" in determining whether the exercise of jurisdiction in Minnesota is unreasonable. *See Creative Calling Sols., Inc.*, 799 F.3d at 982-83.

The contract contemplated that Aurus would pay a commission for clients referred by StoreWorks. In analyzing Aurus' contacts with Minnesota, specifically in connection with the Reseller Agreement, the Court finds *Rust Consulting* persuasive. *Rust Consulting, Inc*, 2018 WL 1247390, at *2-3. *Rust Consulting* involved a contract between Schneider Wallace, a California law firm, and Rust, a Minnesota-based consulting services company. *Id*. Under the contract, Rust employees in Minnesota performed client intake and data management services for the California law firm. *Id*. Schneider Wallace allegedly failed to pay. The Court held that it had specific personal jurisdiction over the defendant because over the course of the project, while certain client data was undoubtedly accessed in California, the performance of the agreement was physically performed in Minnesota. *Id*. at *3.

For instance, while Rust's employees in Minnesota provided "client intake services, project consulting, call center services, and data management," representatives on behalf of the California law firm traveled to Minnesota to help implement the project and train

18

Rust employees. *Id*. at *1-3. A senior Rust employee was also in "frequent contact" with individuals at Schneider Wallace. *Id*. at *3. Schneider Wallace further sent payment to Rust at a Minnesota address. *Id*. The Court concluded that these contacts are "directly related to the causes of action alleged in the complaint" because these "contacts concern the formation and performance of the contract at issue[.]" *Id*.

Here, there are significant similarities with *Rust Consulting*. While certain software services were handled by Aurus in Massachusetts[4]—the performance of the Reseller Agreement was physically performed in Minnesota. The record reflects that Aurus employees traveled to Minnesota to receive sales training and engage in strategic conversations with StoreWorks on attracting potential clients under the Reseller Agreement. (Konkimalla Decl. ¶¶ 14-15.) In the course of attracting referred clients under the Reseller Agreement, Aurus was also in frequent contact with individuals at StoreWorks. (Watkins Decl. ¶¶ 2-3.) Thousands of emails were sent from Aurus to StoreWorks in Minnesota. (Konkimalla Decl. ¶ 12.) Additionally, despite some apparent overlap with meetings that do not appear to relate to the Reseller Agreement, Aurus' executives traveled to Minnesota on at least four occasions to receive sales training from StoreWorks and to engage in "strategic conversations and joint sales efforts" under the

---

[4] The Court also notes that the Reseller Agreement appears to identify a separate agreement governing Aurus' performance of software services for referred clients (*i.e.*, the "SaaS Agreement"). Under the Reseller Agreement, Aurus agreed to execute a SaaS Agreement with referred clients and invoice those clients directly for software services. (*See* Konkimalla Decl., Ex. 2, Section 7 (a) pp. 8.) Thus, to the extent that Aurus argues that it performed software services in Massachusetts as required under the Reseller Agreement, these services appear to be governed by the terms of a separate agreement, the SaaS Agreement. (*See* Def's Reply at 2.)

Reseller Agreement.  (*See* Compl. ¶ 6; Konkimalla Decl. ¶ 14.)

Moreover, Aurus expressly agreed under the Reseller Agreement to "work together with [StoreWorks] to review and finalize . . . performance expectations to ensure [StoreWorks] and [the referred clients'] service needs are met."  (Compl. Ex. A, § 3.2 (a) at pp. 6.)  When jointly working together, Aurus' primary point of contact was StoreWorks employees in Minnesota.  According to Carole Watkins, StoreWorks' Vice President of Client Solutions, Aurus and StoreWorks engaged in two calls a week to discuss one of the referred clients.  (Watkins Decl., ¶ 3.)  Aurus employees would also call her "periodically." (*Id.* ¶ 2.)  Finally, Aurus sent all payments to StoreWorks for referred clients in Minnesota. Thus, as in *Rust Consulting*, because these contacts concern the formation and performance of the Reseller Agreement, the Court holds that Aurus' contacts with this forum relate to the causes of action alleged in the Complaint.  The Court addresses Aurus' remaining arguments in turn.

First, Aurus argues—without citing any supporting legal authority—that this Court cannot exercise jurisdiction over Aurus because none of the referred clients at-issue under the Reseller Agreement are based in Minnesota.  (*See* Def's Reply at 2.)  The Court notes, however, that this case is distinguishable from *CHS Inc. v. Farmers Propane Inc.,* 397 F.Supp.3d 1324 (D. Minn. 2019), in which a court from this District recently dismissed an action for lack of personal jurisdiction because, *inter alia*, the customers of a non-resident defendant were located outside Minnesota.  In *CHS*, the subject of the contract was a propane transaction in which a Minnesota-based company delivered propane to Farmers Propane in Ohio.  *Id.* at 1331.  Farmers Propane's subsequent sales of the propane were to

customers not based in Minnesota. *Id*. When comparing the facts in both cases, the contacts initially appear similar. Both Farmers Propane and Aurus provided services to clients outside Minnesota. Indeed, upon reviewing all three claims in StoreWorks' Complaint, only one claim—StoreWorks' claim for intentional interference—specifically relates to a Minnesota-based client, Target. But StoreWorks concedes that the alleged actions giving rise to this specific claim occurred "primarily and substantially in Massachusetts." (Compl. ¶ 73.)

Upon closer examination, however, this case involves significantly more contacts with the forum despite the referred clients' varying locations. Here, unlike in *CHS*, Aurus' primary point of contact with StoreWorks was with representatives in Minnesota. And while the Court in *CHS* recognized that physical presence in Minnesota is relevant but "not required," Farmers Propane made no trips to Minnesota and had no presence in Minnesota. *See CHS Inc.*, 397 F.Supp.3d at 1331. Moreover, Farmers Propane entered into an original contract with CHS for the sale of propane to one location, Ohio. *Id*. Aurus, on the other hand, made several trips to Minnesota relating to the Reseller Agreement, and owns a data center in Minnesota that stores data for two Minnesota-based clients. As part of the Reseller Agreement, Aurus also jointly targeted clients that were based in Minnesota. *Id*. And, as explained above, Aurus worked closely with StoreWorks in Minnesota to provide software-related services to referred clients in varying locations.

Second, like the defendant in *Rust Consulting*, Aurus relies heavily on the fact that the contract was not negotiated in Minnesota. (*See* Def's Mem. at 1.) It appears, however, that some negotiations took place by emails to and from Minnesota. (Konkimalla Decl. ¶¶

11-13.) The execution of the Reseller Agreement was also accomplished by email, and Aurus sent the fully executed version of the Reseller Agreement to StoreWorks in Minnesota. (Konkimalla Decl., Ex. 1.) Further, Aurus overlooks that renegotiations occurred physically in Minnesota, which the Court finds highly relevant here.[5]

Third, while Aurus argues that StoreWorks' action is unconnected to Minnesota because any alleged breach of the Reseller Agreement occurred in Massachusetts, (Def's Reply at 9), the Court agrees with *Rust Consulting*, and finds this argument unavailing. *Rust Consulting, Inc*, 2018 WL 1247390, at *3, n.2 ("[A]ny defendant could avoid out-of-state litigation by simply making the decision to breach a contract in their home state.")

Finally, Aurus relies on the Massachusetts choice-of-law provisions to defeat personal jurisdiction. (Def's Reply at 8.) However, choice-of-law clauses do not defeat jurisdiction when pointing away from the forum State. *See Creative Calling Sols, Inc.,* 799 F.3d at 982-83 (holding that the Hong Kong choice-of-law clause "does not make the exercise of jurisdiction in Iowa unreasonable.") Nor is there any indication that the parties specifically negotiated for the Massachusetts choice-of-law provisions. *Cf CHS Inc.,* 397 F.Supp.3d at 1331 (finding Minnesota choice-of-law provision less persuasive as a contact with forum State because there was no indication that the parties specifically negotiated this provision).

The Court thus concludes that the three main jurisdictional factors considered by

---

[5] The parties dispute whether Aurus' mediation in Minnesota establishes personal jurisdiction, and whether retaining lawyers in the forum state establishes jurisdiction. (Pl's Opp'n at 24; Def's Reply at 7.) The Court need not reach this issue as the remaining contacts are sufficient to allow this Court to properly exercise jurisdiction over Aurus.

the Eighth Circuit—the nature, quality, and quantity of the defendant's contacts with the forum, and the relation of those contacts to the cause of action—weigh in favor of exercising specific personal jurisdiction over Aurus. The two remaining, secondary factors—the interest of the forum and the convenience of the parties—do not alter the Court's ruling.

In considering the interests of the forum State, the Court finds that this secondary factor does not weigh in Aurus' favor. While the Agreement may select Massachusetts law, Minnesota "has an obvious interest in providing a local forum in which its residents may litigate claims." *Creative Calling Sols., Inc.*, 799 F.3d at 982 (citing *Digi–Tel Holdings, Inc.,* 89 F.3d at 525.) And as explained above, the selection of Massachusetts law does not make the exercise of jurisdiction in Minnesota "unreasonable." *Id*.

As to the convenience of the parties, the respective interests of the parties do not weigh against the exercise of jurisdiction over Aurus in this forum. Aurus asserts in a general fashion that its witnesses and documents are located in Massachusetts. (Def.'s Mem. at 7-8.) Without supporting evidence, Aurus also asserts that "defending this action in Minnesota is extremely cumbersome and expensive." (*Id*. at 7.) But Aurus does not contend that witnesses or documents may be unavailable based on the selection of this forum. In response, StoreWorks counters that several of its expected witnesses, such as StoreWorks' employees and Target or Consensus employees, are located in Minnesota and across the United States. (Pl's Opp'n at 30-31.)

Thus, the Court finds that Aurus' general speculation about the "expense" of litigation, with no specific evidence of such is largely unhelpful "in resolving the question

of which jurisdiction is appropriate." *See*, *e.g.*, *Nelson v. Master Lease Corp*., 759 F. Supp. 1397, 1402 (D. Minn. 1991) (holding defendant's general claims about the expense of moving records insufficient to establish that the convenience of the parties weighed in defendant's favor). Because witnesses are located in both Massachusetts and Minnesota, the respective interests of the two parties do not weigh against the exercise of jurisdiction over Aurus in Minnesota. *See Creative Calling Sols., Inc*, 799 F.3d at 982. Indeed, "[i]n these circumstances, the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice." *Id*.

Accordingly, the Court may exercise specific jurisdiction over Aurus here.

## C. Defendant's Motion to Dismiss under the Doctrine of *Forum Non Conveniens* or, in the Alternative, to Transfer to the District of Massachusetts

As an alternative to dismissal for lack of personal jurisdiction, Aurus requests that the Court dismiss this case based on the common law doctrine of *forum non conveniens*. (Def's Mem. at 8-11.) The Eighth Circuit has made clear, however, that the ability of federal courts to dismiss cases over which they have subject matter jurisdiction on the grounds of *forum non conveniens* "has been substantially eliminated" by the federal transfer of venue statutes. *Bacon v. Liberty Mut. Ins. Co.*, 575 F.3d 781, 783 (8th Cir. 2009). Indeed, that doctrine now "has continuing application [in federal courts] only in cases where the alternative forum is abroad, and perhaps in rare instances where a state or territorial court serves litigational convenience best." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007) (citations and quotation omitted). Where, as is the case here, transfer may be made "wholly within the system of U.S. federal courts," this

Court effectively no longer has the power to dismiss the case outright on grounds that another venue would be a better fit for the parties or the underlying issues. *See Bacon*, 575 F.3d at 783 (quoting *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 717 (7th Cir. 2002)). For this reason, and because the parties both appear to concede that transfer pursuant to statute is a proper alternative to outright dismissal, (*See* Def's Reply at 10-11; Pl's Opp'n at 25-26), the Court will treat Aurus' motion to dismiss on the basis of the doctrine of *forum non conveniens* as a motion to transfer. *See* 28 U.S.C. §§ 1404, 1406, 1631.

For Aurus' motion to transfer, Section 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The party seeking to transfer venue normally bears the burden of establishing that a transfer is warranted. *Terra Int'l, Inc. v. Miss. Chem. Corp.,* 119 F.3d 688, 695 (8th Cir.1997). That burden may not be met simply by showing that the "factors are evenly balanced or weigh only slightly in favor of transfer." *Graff v. Qwest Commc'ns Corp.*, 33 F.Supp.2d 1117, 1121 (D. Minn. 1999) (citation omitted). Rather, the balance of factors must "strongly" favor the movant. *Id.* In making a determination on a transfer motion, this Court considers the convenience of the parties and the witnesses, as well as the interests of justice. *Id.* The presumption favors the plaintiff's choice of forum, especially where the plaintiff resides in the district in which the lawsuit was filed. *Travel Tags, Inc. v. Performance Printing Corp.*, 636 F.Supp.2d 833, 836 (D. Minn. 2007).

Here, Aurus contends that venue would be more proper in the District of Massachusetts because the alleged conduct occurred in Massachusetts. (Def.'s Mem. at

13.)  Additionally, Aurus argues that Massachusetts would be more convenient for Aurus' witnesses, and that it would be "extremely [] expensive" and inconvenient to have to bring its records and relevant witnesses to Minnesota.  (*See id*. at 7, 13.)  Finally, Aurus contends that since Massachusetts law controls the issues in dispute, a Massachusetts court is better equipped to adjudicate the issues presented because it is more familiar with Massachusetts law.  (*Id*. at 13-14.)

The Court is unpersuaded that Aurus has carried its considerable burden of demonstrating that the balance of factors strongly favors transfer.  As an initial matter, the convenience of the parties cannot be said to be demonstrably in favor of Aurus.  Just as it would be inconvenient for Aurus to bring its records and party witnesses to Minnesota, it would be equally inconvenient for StoreWorks to bring the same to the District of Massachusetts.  Transfer of venue does not exist simply to shift the inconvenience from the defendant to the plaintiff.  *Hearth & Home Techs., Inc. v. J & M. Distrib., Inc.,* 12-CV-00686 (SRN/TNL), 2012 WL 5995232, at *9 (D. Minn. Nov. 30, 2012).  Aurus' contention that the alleged conduct occurred in Massachusetts does not change that determination.  At this early stage, while the factors relevant to determining the merits of the dispute cannot be determined with great specificity, StoreWorks has sufficiently plead a connection between this forum and the action.  Further, that Aurus' employees reside in Massachusetts does not diminish the burden that would be placed on StoreWorks or Target employees residing in Minnesota if forced to travel to Massachusetts to testify.  Accordingly, this factor does not favor transfer.

As to the convenience of the witnesses, this Court considers the number of non-

party witnesses, the location of all witnesses, and the preference for live testimony. *See*, *e.g., K–Tel Int'l, Inc. v. Tristar Prods., Inc.*, 169 F.Supp.2d 1033, 1045 (D. Minn.2001). Aurus has identified no likely nonparty witnesses not subject to compulsory process by this Court. Moreover, as to likely party witnesses, Aurus states in a general fashion that all its employees reside in Massachusetts. (Def.'s Mem. at 7.) Other potential witnesses appear to reside either in Minnesota or elsewhere throughout the country. (*See* Pl.'s Opp'n at 30-31.) While there will be some travel involved with litigation in Minnesota, it is not clear that litigation in Massachusetts would be any more convenient, or equally convenient. Thus, the Court concludes that this factor does not favor transfer.

In considering the interests of justice factor, the Court considers, *inter alia*, the plaintiff's choice of forum, judicial economy, the relative ability of the parties to bear the expense of litigating in a distant forum, the obstacles to a fair trial, conflict of law issues, and the advantages of having a local court determine issues of local law. *See, e.g.*, *Terra Int'l, Inc.,* 119 F.3d at 696. Many of these concerns are not relevant here. However, as previously noted, StoreWorks "choice of a Minnesota forum is an important consideration, particularly since it is a Minnesota company." *Advanced Logistics Consulting, Inc. v. C. Enyeart LLC*, No. 09-CV-720 (RHK/JJG), 2009 WL 1684428, *6 (D. Minn. June 16, 2009) (internal quotation and citation omitted).

Aurus argues, however, that because Massachusetts law applies to this dispute, the advantages resulting from adjudication by a Massachusetts judge outweigh StoreWorks' interest in its chosen forum. (Def.'s Mem. at 13.) However, as explained above, this Court can apply Massachusetts law and "the scales would tip very little (if at all) in favor of

transfer because federal courts often are called upon to apply the law of other states."
*Advanced Logistics Consulting, Inc.*, 2009 WL 1684428, at *6; *see also Clergy Fin., LLC v. Clergy Fin. Servs., Inc.,* 598 F.Supp.2d 989, 995 (D. Minn.2009) ( "[C]ourts can ... apply the law of another state as easily as their own.").  Where ample guidance exists on the application of a foreign state's laws—as, unquestionably, is the case in the context of Massachusetts contract law—there is little need to afford any significant weight to this particular consideration.  *See id*.  Certainly, that weight does not offset the presumption in favor of StoreWorks' chosen forum.

All factors thus considered, Aurus has failed to satisfy its heavy burden of demonstrating that the District of Massachusetts is a more convenient forum than the District of Minnesota.  *Id*.

## IV.  ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or under the Doctrine of *Forum Non Conveniens* [Doc. No. 11] is **DENIED**; and

2.   Defendant's alternative Motion to Transfer Venue [Doc. No. 11] is **DENIED**.

Dated: January 21, 2020                                    s/Susan Richard Nelson
                                                                    SUSAN RICHARD NELSON
                                                                    United States District Judge